Filed 10/25/13  P. v. Brown CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C068970 |
| Plaintiff and Respondent, | (Super. Ct. No. 06F00314) |
| v. | |
| ALEX BROWN et al., | |
| Defendants and Appellants. | |

In late December 2005, defendants Alex Brown (Brown), Terry Alexander (Alexander), and David Jacob Carrera (Carrera) broke into the home of Hugo S., beat and sexually assaulted him and others at his house, and stole their property.  In early January 2006, defendants broke into the home of brothers James H. and Jeremy H., beat them and stole their property, kidnapped them, and then broke into the house of James Ramirez, killing him at his doorway.

Defendants were tried together for these crimes.  A jury found them guilty of numerous crimes, including murder, robbery, kidnapping to commit robbery, attempted robbery, carjacking, robbery in concert, assault with a deadly weapon, forcible oral

1

copulation in concert, and forcible penetration by a foreign object. The trial court sentenced them to life without the possibility of parole and additional lengthy indeterminate and determinate terms, including as to Brown, consecutive 25-year-to-life sentences on six counts of forcible oral copulation in concert.

On appeal, defendants raise various issues relating to severance, instructions, evidence, and sentencing, including that Brown's 25-year-to-life sentences on the counts of forcible oral copulation in concert violate ex post facto principles because those sentences were greater punishment than was permitted under the law when the crimes were committed. Finding no ex post facto violation and no prejudicial error on the remaining contentions, we affirm.

FACTUAL AND PROCEDURAL HISTORY

A

*The December 2005 Crimes*

Hugo S. lived alone in a house in Oak Park. He used drugs and sold them. Hugo S. knew defendant Brown because Hugo's niece was married to Brown. He knew defendant Carrera because Carrera was his sister-in-law's cousin.

At night on December 26, 2005, Hugo S. was in his living room when his front door "fl[ew] open and three guys . . . c[a]me in." Hugo S. identified the guys as Carrera, Brown, and an unknown third man (later identified by another victim as defendant Alexander). Defendants threw Hugo S. on the ground, beat him "[e]verywhere," and stole everything in his house, including jewelry, flat screen televisions, computers, motorcycles, and pictures. Defendants ordered him to call somebody with money or else they would kill him. Eventually Hugo S. called Renee M., a friend who sold drugs, and asked her to come over. She told him she would stop by for just a little while, because her roommate, Christopher P., was going to be waiting in the car.

When Renee M. got to Hugo S.'s house, a man invited her in, and when she walked in "the next thing [she] kn[e]w, [she] had a gun in [her] face." She identified the

2

man who invited her in as Carrera and the man with the gun as Alexander. Alexander demanded her money and drugs, but she lied and said she did not have any, even though she had money in her car. A bloodied, shirtless, and tied-up Hugo S. pleaded with her to give them her money or else defendants were going to kill them.

Carrera left to get Christopher P., who was still in the car. While Carrera was gone, Brown ripped Renee M.'s clothes off and punched her in the face, knocking out a tooth. He took her jewelry. He yelled that he was going to "rape [her] ass." When she said she was on her period and had a "plug in," he told her to take it out and throw it at Hugo S. She complied, but when Brown tried to rape her, Carrera walked in with Christopher P. and was holding a gun.

Carrera gave the gun back to Alexander and then the three defendants beat up Christopher P., asked him whether he was a gang member, and undressed him. Brown starting spanking Christopher P., asking him if "he was a faggot."

Wanting the beating to stop, Renee M. told Carrera she had money in her car, and Carrera came back with about $2,000 and some methamphetamine.

After Carrera came back, defendants started taking pictures of Renee M., Christopher P., and Hugo S. Defendants had them stand up and pose in different positions. They pushed Renee M.'s face onto Hugo S.'s genitals and told her to "suck him." Then they made her sit on Christopher P.'s face with her vagina touching it. The victims complied because there was a gun to their heads. Brown tried to poke an antenna "at [Renee M.'s] butt," but she squirmed away. Defendants made Renee M. put her finger inside Christopher P.'s anus, with the gun used for compliance. Carrera then positioned Renee M. "doggy style" and tried to have Hugo S. penetrate her from behind, but he could not get an erection. Simultaneously, defendants pushed Renee M.'s face down on Christopher P.'s genitals.

Around 1:30 a.m. or 2:00 a.m. the following morning (December 27, 2005), a neighbor named David T. came to Hugo S.'s house to buy drugs. Carrera answered the

3

door, and David T. recognized him because he knew Carrera's older brother.  Carrera and the two other defendants took David T.'s personal belongings and severely beat him, requiring three days' hospitalization.

After beating up David T., defendants left,  but before they did, Carrera and Brown said "Oak Park Bloods" and threatened to kill all of the victims.

On December 31, 2005, Dominic G. (whose sister Sophia G. was dating Carrera) was hanging out at Carrera's house.  Alexander or Carrera showed Dominic G. a picture on a phone depicting "naked people," a "[g]uy behind a girl," and said they had made them have sex with each other and "made a girl give a guy head."  They also showed Dominic G. the jewelry they had taken.  Carrera told Dominic G. that Brown was the third person involved in the invasion of Hugo S.'s house.

Brown sold his friend Mohamad A. a big screen television that was stolen from Hugo S. during the home invasion.  Brown gave his ex-wife jewelry that had been stolen from Renee M. during the home invasion.

B

*The January 2006 Crimes*

On December 31, 2005, Brown borrowed a maroon Hummer from Mohamad A.'s cousin.

On the evening of January 2, 2006, Brown and Alexander were hanging out with Carrera in his house, along with Dominic G.  Defendants were snorting cocaine.  Carrera or Alexander asked Dominic G. if they could rob "[his] friend."  Dominic thought they were talking about his friend Jeremy H. with whom Dominic "did business" and whom he had mentioned one month back when defendants had previously brought up the topic of robbing one of Dominic's friends.  At that time, Dominic G. had told Carrera and Alexander where Jeremy H. lived, what kind of drugs he sold, and what kind of car he drove (a white one with large rims).  Within the month, Carrera had scoped out the house.

4

This time, Dominic G. drew a diagram of the inside of Jeremy H.'s house. The three defendants then left.

Around 2:00 or 3:00 a.m. on January 3, 2006, James H. (the brother of Jeremy H.) was playing video games when he heard a big truck or Hummer drive by the house in which he lived with his brother and mother. Jeremy H. sold marijuana, which he kept in his room and in a safe in the detached garage. James H. heard a knock at the door and saw two men (Brown and Alexander) standing outside. Brown and Alexander kicked in the door and ran into the house. James H. tried unsuccessfully to barricade himself in his brother's room, but Brown and Alexander kicked down the bedroom door and started pistol-whipping both brothers. Brown and Alexander asked the brothers for marijuana and money, severely beat them, threatened to kill them, and ransacked the room. Eventually, Jeremy H. gave Brown and Alexander the key to the safe and led them to the backyard detached garage where the safe was. There was not much marijuana or money in the safe, which upset Brown and Alexander, and they again threatened to kill Jeremy H. Brown and Alexander ended up taking $60 from the drawers in the bedroom and some of Jeremy H.'s jewelry. They wanted to know where Jeremy H. got his marijuana. Jeremy H. was selling drugs with Ramirez (the eventual murder victim), and they got the marijuana from Matt B. who lived in Curtis Park. Jeremy H. told them, " 'I can get . . . hold of [Ramirez] but I don't have no way to get a hold of Matt. I can't help you get to Matt but [Ramirez] might be able to.' " Brown and Alexander said, " 'All right. Well let's go. We are going to get him.'"

Brown and Alexander stole the key to Jeremy's Buick and forced the brothers into the Buick. Alexander drove and Brown was in the rear passenger seat. They could not find Matt B.'s house, so Brown and Alexander asked where Ramirez lived. Jeremy said he lived in Land Park and he should have money or be able to get in touch with Matt. B. In the car, Brown snorted drugs.

5

Sometime during this drive, Alexander returned to Carrera's house and told Dominic G. they had the brothers outside. Dominic looked outside and saw Jeremy H.'s car. Alexander put marijuana and jewelry in the house and left.

Alexander and Brown drove in Jeremy H.'s car to Ramirez's Land Park home. Using a gun for compliance, Brown and Alexander made Jeremy H. knock on the door to wake Ramirez. While walking up to the house, Jeremy H. saw a red Hummer. After Jeremy H. knocked and the door opened, Brown "basically engaged [with Ramirez] while [Ramirez] was opening the door, and the gun went off that quick. It was no more than a second." Brown had shot Ramirez fatally in the chest. Jeremy H. ran into Ramirez's backyard and waited there until police arrived. James H. eventually fled on foot to his cousin's house.

That night, sometime after 8:00 or 10:00 p.m., Carrera, who was driving a dark red Hummer, picked up his girlfriend Sophia G. While Carrera and Sophia G. were in the Hummer, Alexander called Carrera and told him to meet him by the baseball diamonds in South Land Park. Thereafter, Sophia G. heard Alexander say, " 'They don't have it. We are going somewhere else. We have to go somewhere else.' " Carrera explained to Sophia G. that "whoever was in the car didn't have the weed or the money that they were going to get from them. So they were going to take [them] somewhere else to get it." When Carrera and Sophia G. arrived near the baseball diamonds, Sophia G. saw Alexander jump out of the driver's seat of a white car. Alexander ran up to the Hummer's window and said, "they had to go somewhere else." So Carrera followed the white car to the court where Ramirez lived. Brown then got out of the passenger's side of the white car with a gun in hand and was walking with a young man (Jeremy H.), who looked "so scared." Sophia G. heard a gunshot and a "really loud scream" from a man's voice and saw Brown run back into the white car. A short time later, Brown and Alexander jumped out of the white car and into the backseat of the Hummer, and Brown said he "had to do it." Brown and Alexander eventually got rid of the gun. Carrera did

6

not return the Hummer until after this incident, at which time he told Mohamad A. the police might be looking for it.

## C

### *Events After Both The December 2005 Home Invasion*
### *And The January 2006 Murder*

Within a month of the two sets of crimes, Dominic G. and Sophia G. met Alexander at Mr. Perry's Restaurant. Alexander told them "everything that had happened the whole time they were [at Hugo. S.'s house]," including that they had gone there to "get some money or some drugs," "they started making [the victims] take their clothes off," the woman "was on her period" and "it was really gross," he "started laughing about the whole thing . . . and it just started getting just really gross."

Brown was interviewed by police in August 2007. Among other things, Brown said he did not know Alexander.

## D

### *Gang Evidence*

According to Dominic G., Carrera was a member of the 33rd Street Oak Park gang. According to Sophia G., Alexander was part of a subset of the Oak Park gang called Ride-Zilla.

According to the People's gang expert, Carrera and Alexander were validated Oak Park Blood gang members and Brown was an associate. The expert was of the opinion that a hypothetical home invasion mirroring the facts of Hugo S.'s home invasion was committed for the benefit of the Oak Park Bloods.

## E

### *Uncharged Misconduct*

Carrera committed four uncharged crimes. The first was when Carrera made David S. strip naked, put on a pair of woman's thong underwear, and then assaulted him, while Carrera's friend took pictures. The second was when Carrera instigated the home

7

invasion robbery of Larry V. The third was with Dominic G. and "Bill" when Carrera instigated a home invasion of "Tony", but they left Tony's neighborhood when Dominic could not figure out which house it was. And the fourth was with Dominic G. and Alexander present, when Carrera robbed a man who came to his house to buy crystal methamphetamine.

Alexander had one uncharged act of misconduct. In January 2009, Alexander admitted to police in an interview that he had a "bad drug problem," which involved him using $25 to $150 worth of pure cocaine a day, including the day of the police interview.

DISCUSSION

I

*The Trial Court Did Not Err In Denying Defendants' Motions*

*To Sever The Counts Relating To The Murder (Counts One Through Six)*

*From The Counts Relating To Hugo S.'s Home Invasion*

*(Counts Seven Through Twenty-One)*

Carrera and Brown contend the court violated their federal and state constitutional rights when it denied defendants' motions to sever the counts relating to the murder (counts one through six) from the counts relating to Hugo S.'s home invasion (counts seven through twenty-one). As we explain, the trial court was well within it discretion to deny the motions. (*People v. Kraft* (2000) 23 Cal.4th 978, 1030 [standard of review].)

"An accusatory pleading may charge two or more different offenses connected together in their commission . . . under separate counts . . . ." (Pen. Code, § 954.) Where the statutory requirements for joinder are satisfied, the "[d]efendant . . . can predicate error . . . only on a clear showing of potential prejudice." (*People v. Kraft* (2000) 23 Cal.4th 978, 1030.) We review the trial court's ruling on defendants' severance motions for abuse of discretion. (*Ibid.*) " ' "Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the

8

jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case." ' " (*Ibid.*)

Here, Carrera and Brown argue the evidence was not cross-admissible and the gang and sexual evidence associated with counts seven through twenty-one was "unusually inflammatory." We disagree with both arguments.

The evidence was cross-admissible because the two sets of crimes were connected in their commission. As the trial court put it, the gang evidence was "relevant and admissible in the homicide case regardless of the lack of [the gang enhancement] on the very crucial issues . . . [of] intent, motive, existence of a conspiracy, cooperation or lack of cooperation of the witnesses, and how they may respond to questioning during trial." In line with the trial court's reasoning, our Supreme Court has held "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

Furthermore, as the trial court also explained, the similarities between the counts relating to the murder and those relating to Hugo S.'s home invasion was "striking." "The target, the method and the goals [of the crimes] [w]ere virtually identical." Both the murder and Hugo S.'s home invasion involved the same defendants who were members of the Oak Park Blood criminal street gang; they targeted similarly situated individuals in the drug trade who possessed or had access to drugs and/or money; they commenced the offenses in a similar manner through home invasions with a substantial degree of

violence and threats, including using firearms; and sought to obtain drugs, money, or other valuables in both incidents.

As to defendants' argument the counts related to the murder should have been severed from the counts related to Hugo S.'s home invasion, because the gang and sexual evidence associated with counts seven through twenty-one were "unusually inflammatory," as the trial court aptly noted, neither of the two events was more inflammatory than the other. "One . . . involve[d] senseless, cruel sex acts, while the other involve[d] a[] . . . completely senseless killing." Where defendants "ha[v]e not shown that one of the offenses was significantly more likely to inflame the jury against defendant[s]," they "failed to establish prejudice." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1317.)

Given the cross-admissibility of the evidence and defendants' inability to establish prejudice from the failure to sever, the court was well within its discretion to deny defendants' motions to sever the offenses related to the murder from the offenses related to Hugo S.'s home invasion.

II

*The Trial Court Did Not Err In Denying Alexander's*
*And Brown's Motions To Sever Their Cases From Carrera's*

Alexander and Brown contend trial court violated their federal and state due process rights when it denied their motions to sever their cases from Carrera's.

"Under [Penal Code] section 1098, '[w]hen two or more defendants are jointly charged . . . they must be tried jointly, unless the court order[s] separate trials.' In light of this legislative preference for joinder, separate trials are usually ordered only ' "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." ' "

(*People v. Box* (2000) 23 Cal.4th 1153, 1195.)  A trial court's ruling on a severance motion is reviewed for abuse of discretion.  (*Ibid.*)

Alexander and Brown argue that severance was required because evidence of Carrera's guilt was overwhelming while theirs was not.  As we explain, there was no abuse of discretion because the evidence of Alexander's and Brown's guilt was strong and there was no prejudicial association with Carrera.

A

*Alexander*

As to the December 2005 crimes, the evidence of Alexander's guilt was strong. Renee M. identified him as a perpetrator both in a photographic lineup and in court. Alexander himself told Sophia G. and Dominic G. at Mr. Perry's Restaurant "everything that had happened the whole time they were [at Hugo. S.'s house]," including that they had gone there to "get some money or some drugs," "they started making [the victims] take their clothes off," the woman "was on her period" and "it was really gross," he "started laughing about the whole thing . . . and it just started getting just really gross." In a separate conversation at Carrera's house, Alexander or Carrera showed Dominic G. a picture on a phone depicting "naked people," a "[g]uy behind a girl," said they had made them have sex with each other and "made a girl give a guy head."  They also showed Dominic the jewelry they had taken.

Similarly, evidence of Alexander's guilt of the January 2006 crimes was strong. While Carrera and Sophia G. were in the Hummer, Alexander called Carrera and said to meet him by the baseball diamonds in South Land Park.  Thereafter, Sophia G. heard Alexander say, " 'They don't have it.  We are going somewhere else.  We have to go somewhere else.' "  Sophia  G. saw Alexander jump out of the driver's seat of the white car.  James H. picked out Alexander from a photographic lineup, stating he resembled the driver.  Dominic G. testified Alexander was involved in the incident (the murder) with Carrera and Brown and stated, among other things, Alexander came back to Carrera's

11

house after being gone for a couple of hours and said, " 'we have them outside,' " explaining it was "the guys or the brothers." After that, Alexander called Dominic G. and said he was trying to have one of the brothers tell him where James Ramirez lived and the brothers said they did not know, to which Alexander replied, "they were lying."

## B

### *Brown*

As to the December 2005 crimes, Hugo S. identified Brown as one of the perpetrators. Hugo S. told his sister that Brown had put a gun to his head during the home invasion. Carrera told Dominic G. that Brown was the third person involved in the home invasion. Alexander told Sophia G. and Dominic G. that he (Alexander), Carrera, and Brown were involved in the invasion of Hugo S.'s house. Mohamad A. bought a big screen television from Brown that was stolen from Hugo S. during the home invasion. And Brown gave his ex-wife jewelry that had been stolen from Renee M. during the home invasion.

Similarly, evidence of Brown's guilt of the January 2006 crimes was strong. Brown borrowed a maroon Hummer matching the description of the car involved in the crimes before the incident and did not return it until after the incident, at which time he told Mohamad A. the police might be looking for it. Dominic G. identified Brown as being with Alexander and Carrera when they left for the residence of the H. brothers. Sophia G. saw Brown get out of the white car with a gun and then, after she heard a gunshot and a "really loud scream" from a man's voice, she saw Brown run back into the car. When Brown got back into the car, Brown said he "had to do it." Brown and Alexander got rid of the gun.

## C

### *No Prejudicial Association*

This evidence leads us to conclude there is no merit to Alexander and Brown's contention that severance was compelled by the factor of prejudicial association. The

evidence here showed that all defendants "took an active role in the commission of the crimes; this is not a situation in which a marginally involved defendant might have suffered prejudice from joinder with a codefendant who participated much more actively. Nor is this a situation in which a strong case against one defendant was joined with a weak case against a codefendant." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 43.)

## D

### *Effect Of Carrera's Uncharged Acts Evidence Against Alexander And Brown*

Alexander and Brown argue that the trial court's refusal to sever their cases from Carrera's allowed the jury to decide Alexander's and Brown's fate based on "a series of brutal crimes committed by Carrera with which [Alexander and Brown] w[ere] not involved." But the jury was instructed to "[c]onsider evidence offered against one defendant against that defendant only and not against any other defendant," and we presume the jury followed the instructions. (*People v. Homick* (2012) 55 Cal.4th 816, 851.)

## E

### *Conclusion*

In sum, "given the prosecution's independent evidence of defendants' guilt and the trial court's carefully tailored limiting instructions, which we presume the jury followed . . . we find no abuse of discretion in the denial of severance. For the same reasons, defendants' claims that the joint trial deprived them of their federal constitutional rights . . . likewise must fail." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th. at p. 44.)

## III

### *The Error In Instructing The Jury It Could Use Alexander's Uncharged Misconduct (Here, Drug Use) For Intent And Plan Was Harmless*

Alexander contends the trial court erred in instructing the jury "it could rely on uncharged misconduct evidence admitted against Carrera to prove identity, motive,

13

intent, or the existence of a plan or scheme in the separate case against . . . Alexander."
As we explain, the only error in the instruction regarding uncharged misconduct evidence
was that the instruction allowed the jury to consider Alexander's drug use for purposes
other than motive, i.e., for intent and plan, but this error was harmless.

A

*Uncharged Misconduct Evidence*

The trial court allowed the People to introduce evidence that Carrera had
committed four uncharged crimes: (1) Carrera made David S. strip naked, put on a pair
of woman's thong underwear, and then assaulted him, while Carrera's friend took
pictures; (2) Carrera instigated the home invasion robbery of Larry V.; (3) with Dominic
and "Bill," Carrera instigated a home invasion of "Tony", but they left Tony's
neighborhood when Dominic could not figure out which house it was; and (4) with
Dominic and Alexander present, Carrera robbed a man who came to his house to buy
crystal methamphetamine.

The trial court also allowed the People to introduce evidence in the form of a
police interview in January 2009 that Alexander admitted to police he had a "bad drug
problem," which involved him using $25 to $150 worth of pure cocaine a day, including
the day of the interview. The court told the parties it was allowing in the evidence to
show motive for theft.

B

*The Uncharged Misconduct Instructions*

The trial court instructed as follows regarding the evidence of uncharged
misconduct:

"You may consider this evidence only if the People have proved by a
preponderance of the evidence that a defendant in fact committed the uncharged offenses.

14

"Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden, you must disregard this evidence entirely. If you decide that the defendant committed the uncharged offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not:

"One, the defendant acted with the requisite intent to commit the offenses alleged, and/or with the intent to agree to enter a conspiracy to commit the offenses alleged, and/or with the intent to aid and abet the offenses alleged in this case; or

"Two, the defendant had a motive to commit the offenses alleged in this case; or

"Three, the defendant had a plan or scheme to commit the offenses alleged in this case.

"In evaluating this evidence, consider the similarly or lack of similarity between the uncharged offenses and the charged offenses.

"Do not consider this evidence for any other purpose.

"Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.

"Consider evidence offered against one defendant against that defendant only and not against any other defendant.

"[¶] . . . [¶]

"If you conclude that a defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged offenses. The People must still prove each charge and allegation beyond a reasonable doubt."

15

C

*The Only Error In The Instruction Was Allowing Alexander's Uncharged Misconduct To Be Used For Purposes Other Than Motive, But The Error Was Not Prejudicial*

Alexander contends this instruction was unconstitutional for two reasons: (1) it "created a reasonable likelihood that the jury inappropriately considered *Carrera's* prior crimes when determining *Alexander's* guilt"; and (2) it "allow[ed] the jury to consider this evidence for identity, intent, or common scheme -- purposes for which this evidence was neither offered nor admitted."

As to Alexander's first reason, he is wrong because there is no "reasonable likelihood" the jury understood the instruction to allow consideration of Carrera's prior crimes to determine Alexander's guilt. (See *People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) The instruction explicitly stated the contrary, namely, the jury could "Consider evidence offered against one defendant against that defendant only and not against any other defendant."

As to Alexander's second reason, he is partially wrong because the instruction did not allow the jury to consider the uncharged misconduct for identity (as Alexander claims it did) but it did (erroneously as to Alexander) allow the jury to consider the evidence for intent and plan. It was error for the jury to consider the uncharged misconduct for intent and plan because the court specifically told the parties it was allowing the evidence of Alexander's drug use to show only motive.

Still, there was no prejudice. As Alexander himself concedes, the prosecutor "never once made even a passing reference to [Alexander's] drug use admissions as uncharged acts." And, even if we accept the premise of Alexander's argument that the "major question for the jury to resolve in connection with Mr. Alexander was one of identity -- whether he was involved," as we have noted, the instruction never told the jury it could consider the uncharged misconduct to prove identity. On this record, the error in

16

instructing the jury that it could use Alexander's uncharged misconduct for intent and plan was harmless.

IV

*The Trial Court's Instruction On Uncharged Misconduct Did Not Violate*

*Alexander's Sixth Amendment Right To Effective Assistance Of Counsel*

In an argument related to the last one, Alexander contends that "because the trial court had made clear the jury would be properly instructed on the limits of the uncharged acts evidence, the trial court's actual instruction -- which ignored these limits completely -- deprived . . . Alexander of the effective assistance of counsel in confronting the evidence." His contention is based on the following law: "Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 686 [80 L.Ed.2d 674, 692].) He argues that because the trial court told counsel the only piece of uncharged act evidence against Alexander would be his cocaine use and it could be used only to prove motive and instead the court allowed Carrera's four uncharged acts to be used against Alexander and allowed all the uncharged acts to be used also for identity, intent, and common plan, counsel was unable to plan his defense strategy appropriately. He notes that defense counsel did not ask questions of the witnesses about Carrera's prior crimes (presumably, because counsel had no way of knowing that the court would allow Carrera's uncharged acts to be used against Alexander).

The major premise of Alexander's argument is wrong. As we noted in part III of the Discussion, the court's instruction never stated Carrera's uncharged acts could be used against Alexander. To the contrary, the jury was instructed to "[c]onsider evidence offered against one defendant against that defendant only and not against any other defendant." While Alexander is correct the court erroneously allowed his uncharged misconduct of drug use to be used for purposes other than motive (i.e., intent and plan),

17

his only argument as to why this instruction interfered with counsel's ability to make independent decisions about how to conduct the defense is that "based on this [purported] limited use [of Alexander's uncharged drug use], defense counsel did not confront this evidence or call the detective who elicited these statements." However, this argument does not explain why enlarging the purpose for which this evidence could be used (namely, for intent and plan) would have interfered with defense counsel's strategy. Indeed, it appears that counsel's strategy was to ignore the drug evidence in hope that the prosecutor would not mention it as well. This strategy worked, as the prosecutor never mentioned Alexander's drug use for motive, intent, or plan in committing the current crimes.

The cases Alexander cites for support that the trial court's conduct interfered with his Sixth Amendment right to counsel are inapposite because in those cases, defense counsel was actually prevented from representing the defendant during a critical part of the trial or was prevented from independently deciding how to conduct the defense. (See, e.g., *Geders v. United States* (1976) 425 U.S. 80, 91 [47 L.Ed.2d 592, 601] [trial court's order preventing the defendant from consulting his counsel " 'about anything' " during a 17-hour overnight recess between his direct and cross-examination impinged upon his right to the assistance of counsel guaranteed by the Sixth Amendment] ; *Herring v. New York* (1975) 422 U.S. 853, 865 [45 L.Ed.2d 593, 595, 602] [a New York law that allowed the judge in a nonjury criminal trial the power to deny counsel any opportunity to make a summation of the evidence before the rendition of judgment denied the defendant the assistance of counsel that the Constitution guarantees]; *Brooks v. Tennessee* (1972) 406 U.S. 605-606, 613 [32 L.Ed.2d 358, 360, 364] [a Tennessee state law that required a criminal defendant " 'desiring to testify [to] do so before any other testimony for the defense is heard by the court trying the case' " violated the defendant's federal constitutional rights].) Nothing like that happened here.

18

V

*The Trial Court Correctly Did Not Instruct On Assault*

*As A Lesser Included Offense*

Alexander contends the court erred in failing to sua sponte instruct on assault as a lesser included offense to the robberies of the H. brothers and attempted robbery of Ramirez. His argument is based on the fact the information charged Alexander with robbery and attempted robbery by "force and fear," instead of by "force or fear" as is the statutory definition of robbery (Pen. Code, § 211). According to Alexander, an element of force was "essential to the robbery convictions," and here, there was evidence that when force was used, he did not have the intent to permanently deprive because he was under the influence of cocaine, so "assault was a lesser included offense on which the jury should have been instructed."

This court has rejected a similar argument in *People v. Wright* (1996) 52 Cal.App.4th 203. In *Wright*, we explained that the word "force" used in robbery has a broader meaning than "force" used in assault. (*Id*. at pp. 210-211.) " '[T]he force by means of which robbery may be committed is either actual or constructive,' " and " 'force' is not an element of robbery independent of 'fear'; there is an equivalency between the two." (*Ibid*.) " ' "[T]he coercive effect of fear induced by threats . . . is in itself a form of force, so that either factor may normally be considered as attended by the other." ' " (*Id*. at p. 211.) Therefore, we concluded that assault is not a lesser included offense of robbery, even when the robbery is charged using the conjunctive "force and fear" language and there was evidence of intoxication. (*Ibid*.)

Alexander acknowledges *Wright* and its potential applicability to this case. However, he urges us to reject the decision as poorly reasoned and inconsistent with other authority. We find our analysis in *Wright* persuasive and will apply it here. We therefore conclude, similar to *Wright*, that the trial court did not err in not instructing on assault as a lesser included offense of robbery or attempted robbery.

19

## VI

*The Court Did Not Err In Instructing*

*On Motive Pursuant To CALCRIM No. 370*

Alexander and Brown contend the instruction on motive in CALCRIM No. 370 (stating the People were not required to prove defendant had a motive to commit the charged crime) reduced the People's burden of proof because it conflicted with the instruction on kidnapping for the purpose of robbery (stating the jury had to find that defendants "intended to commit robbery"). They argue that because the information charged them with kidnapping for robbery, the jury was "required . . . to determine whether they committed the kidnapping to further the robbery."

As Alexander and Brown recognize, the Fifth Appellate District rejected a similar argument in *People v. Fuentes* (2009) 171 Cal.App.4th 1133. There, the issue was whether the motive instruction conflicted with the instructions for the substantive offense of criminal street gang participation and the sentence enhancement and special circumstance provisions related to criminal street gangs and lessened the People's burden of proof on those issues. (*Id.* at p. 1139.) In rejecting this argument, the court noted the following: "An intent to further criminal gang activity is no more a 'motive' in legal terms than is any other specific intent. We do not call a premeditated murderer's intent to kill a 'motive,' though his action is motivated by a desire to cause the victim's death. Combined, the instructions here told the jury the prosecution must prove that Fuentes intended to further gang activity but need not show what motivated his wish to do so. This was not ambiguous and there is no reason to think the jury could not understand it. (*Id.* at pp. 1139-1140.)

Alexander and Brown argue *Fuentes* was wrongly decided. They offer an analogy to financial gain special circumstance cases as authority we should rely on to reject *Fuentes*. In those cases, they argue, the Supreme Court interchanged "intent" and "motive." (See, *e.g.*, *People v. Carasi* (2008) 44 Cal.4th 1263, 1308-1309; *People v.*

20

*Staten* (2000) 24 Cal.4th 434, 461; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1026-1027.) In defendants' view, a defendant's motive to gain financially from a murder is no different from an intent to do so. The problem with defendants' analogy is that the Supreme Court repeatedly has rejected it. (*Edelbacher*, at p. 1027; *People v. Riggs* (2008) 44 Cal.4th 248, 314; *People v. Crew* (2003) 31 Cal.4th 822, 845; *People v. Noguera* (1992) 4 Cal.4th 599, 637.)

Nevertheless, Alexander and Brown contend our Supreme Court rejected the argument only because the financial gain motive was included in an enhancement, not as an element of the charged offense. They argue, "the jury would have plainly understood that the motive instruction applied to this charge." We disagree, again based on *Fuentes*.

The *Fuentes* court has explained: "If Fuentes's argument has a superficial attractiveness, it is because of the commonsense concept of a motive. Any reason for doing something can rightly be called a motive in common language, including—but not limited to—reasons that stand behind other reasons. For example, we could say that when A shot B, A was motivated by a wish to kill B, which in turn was motivated by a desire to receive an inheritance, which in turn was motivated by a plan to pay off a debt, which in turn was motivated by a plan to avoid the wrath of a creditor. That is why there is some plausibility in saying the intent to further gang activity is a motive for committing a murder: A wish to kill the victim was a reason for the shooting, and a wish to further gang activity stood behind that reason. The jury instructions given here, however, were well adapted to cope with the situation. By listing the various 'intents' the prosecution was required to prove (the intent to kill, the intent to further gang activity), while also saying the prosecution did not have to prove a motive, the instructions told the jury where to cut off the chain of reasons. This was done without saying anything that would confuse a reasonable juror." (*People v. Fuentes*, *supra*, 171 Cal.App.4th at p. 1140.)

21

Here, similar to *Fuentes*, Alexander and Brown have confused motive with the specific intent requirement of the kidnapping for robbery offense.  Motive describes the reason a person decides to commit a crime.  The reason, however, is different from a required mental state, such as specific intent.  (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503-504.)  The jury was instructed here pursuant to CALCRIM No. 1203 on the elements of kidnapping for robbery and was told that the crime was "kidnapping for the purpose of robbery" and instructed that the defendant had to "intend[] to commit robbery" and that "acting with that intent," the defendant had to take, hold, or detain another person by using force or by instilling a reasonable fear.  The court's instruction did not use the word "motive" and there is no indication the jury would have used the term "motive" and "intent" interchangeably.  Just as in *Fuentes*, there was no error.

VII

*The Trial Court Did Not Err In Its Accomplice Instructions*

Alexander and Brown contend the court violated their federal due process rights in instructing the jury that it could not find them guilty of counts one through six relating to the murder unless Dominic G.'s testimony was corroborated.  They argue that the instruction erroneously allowed the jury to find them guilty of counts seven through twenty-one related to the crimes at Hugo S.'s home based solely on Dominic G.'s accomplice testimony.

The instruction to which Alexander and Brown refer was CALCRIM No. 335, which as given here stated in pertinent part as follows:  "if the crimes charged in Counts 1 - 6 were committed, then Dominic [G.] was an accomplice to those crimes"; "You may not convict a defendant of the crimes charged in Counts 1 - 6 based on the statement or testimony of an accomplice alone."  Defendants argue the instruction was wrong because it stated Dominic G. was an accomplice only to counts one through six.

Defendants are wrong because Dominic G. was not an accomplice to the other counts.  "For instructional purposes, an accomplice is a person 'who is liable to

22

prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' " (*People v. Arias* (1996) 13 Cal.4th 92, 142-143.)  There was no evidence implicating Dominic G. in counts seven through twenty-one, which were the December 2005 crimes.  Rather, defendants point to the fact that one of the defendants told Dominic G. about the December 2005 robbery and showed him pictures of the forced sex acts, that Alexander told Dominic G. and his sister Sophia G. about the robbery in great detail when they were all at Mr. Perry's Restaurant, and that jewelry from the robbery was being passed around at Carrera's house.  However, none of this was evidence that Dominic G. was liable for prosecution for the December 2005 crimes as charged in counts seven through twenty-one.  Therefore, Dominic G. was not an accomplice to those crimes and the court correctly omitted those counts from accomplice instruction as it related to Dominic G.

VIII

*The Trial Court Did Not Err In Denying Carrera's Motion For New Trial That Was Based On The People's Alleged Failure To Disclose Exculpatory Brady Material*

Carrera contends the People violated its duty to disclose all exculpatory evidence to the defense under *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] , which he raised in an unsuccessful motion for new trial.  As we explain, the trial court was well within its discretion to deny the motion for new trial because there was no *Brady* information to disclose.  (See *People v. Hoyos* (2007) 41 Cal.4th 872, 917, fn. 27 [abuse of discretion review for a trial court's ruling on a motion for new trial]; *People v. Salazar* (2005) 35 Cal.4th 1031, 1042 [de novo standard of review for the issue of whether the defendant established the elements of a *Brady* claim].)

"In *Brady*, the United States Supreme Court held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'  [Citation.]  The high court has extended the prosecutor's

23

duty to encompass the disclosure of material evidence, even if the defense made no request concerning the evidence. [Citation.] The duty encompasses impeachment evidence as well as exculpatory evidence." (*People v. Hoyos*, *supra*, 41 Cal.4th at p. 917.) " 'There are three components of a true *Brady* violation: [(1)] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [(2)] that evidence must have been suppressed by the State, either willfully or inadvertently; and [(3)] prejudice must have ensued.' " (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1043.)

The alleged *Brady* material here was the People's failure to disclose that it was giving a case in which Jeremy H. was the defendant a " 'fresh look,' " which Carrera claimed was "potential impeachment as to [Jeremy H.'s] state of mind while he was on the witness stand." Specifically, the new trial motion argued the following: "at the time [Jeremy H.] was on the witness stand it had been communicated to his attorney that the District Attorney's Office was actively reinvestigating his case and pursuing leads that could result in any number of outcomes favorable to [Jeremy H.]-lowering bail, release on own recognizance, a favorable plea bargain offer or outright dismissal." Carrera argued the People had suppressed this " 'fresh look' " evidence and he was prejudiced because he could not effectively cross-examine Jeremy H.

In denying Carrera's motion for new trial, the court concluded there was no impeachment or exculpatory evidence the People failed to disclose. The trial court was correct. The People presented the testimony of the deputy district attorney working on Jeremy H.'s case who testified the case was not "in any way getting any special treatment or any fresh look . . . based on the fact that [he] was a witness in this case." Jeremy H.'s case was dismissed for insufficient evidence because "the lab reports, the DNA reports and the two ballistics reports" "were exculpatory as to [Jeremy H.]." The People also presented the testimony of Jeremy H.'s attorney who testified "there [were] [n]ever at all any promises, offers, or any inducements that related to [Jeremy H.] and [the case in

24

which he was defending Jeremy H.]" and there was no "indication or any conversation . . . about the fact that [Jeremy H.] was going to testify [in this case] and how it might impact the case he was charged with." As the trial court concluded, "[t]here's absolutely no evidence on this record which credibly suggests that the dismissal had anything to do with the case against the defendants [in this case]." And "the fact that the forensics testimony supported [Jeremy H.'s] innocence in no way affected his potential impeachment and would have made absolutely zero difference to the fact finder in this case, particularly in light of the mountain of devastating evidence against these defendants." On this record, the trial court did not abuse its discretion in denying defendant's new trial motion because there was no *Brady* violation.

IX

*The Court Did Not Err In Instructing Pursuant To CALCRIM No. 362*

*On Brown's False Statement As An Awareness Of Guilt*

Brown contends the court violated his federal constitutional rights when it instructed pursuant to CALCRIM No. 362, regarding consciousness of guilt because the instruction permitted the jury to draw irrational presumptions of guilt. Based on evidence that Brown lied to the police when he said he did not know Alexander, the trial court instructed as follows: "If a defendant made a false or misleading statement relating to the charged crimes, knowing the statement was false or intending to mislead, that conduct may show that he was aware of his guilt of the crime and you may consider it in determining his guilt. You may not consider the statement in deciding any other defendant's guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide the meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

Brown acknowledges that our Supreme Court has rejected similar challenges to the constitutionality of CALCRIM No. 362's predecessor, CALJIC No. 2.03 (*People v. Crandell* (1988) 46 Cal.3d 833, 871, overruled on another point *in People v. Crayton*

25

(2002) 28 Cal.4th 346, 364-365), as well as other consciousness of guilt instructions (*People v. Bolin* (1998) 18 Cal.4th 297, 327).   Still, Brown contends that the slight difference in the phraseology between CALCRIM No. 362 and CALJIC No. 2.03 makes the current instruction unconstitutional.  We disagree.

CALJIC No. 2.03 allows a jury to consider a defendant's false statement "as a circumstance tending to prove a consciousness of guilt."  According to Brown, even if CALJIC No. 2.03's language does not interfere with the constitutional prohibition against directing or compelling a jury to draw an impermissible inference (*People v. Crandell*, *supra*, 46 Cal.3d at pp. 870-871), CALCRIM No. 362 does.  In Brown's view, the problem with the phrase in CALCRIM No. 362, "aware of his guilt of the crime," is that it allows the jury to infer consciousness of guilt of the specific crimes charged, including a defendant's mental state at the time of the offenses.  We rejected a similar argument against CALCRIM No. 362 in *People v. McGowan* (2008) 160 Cal.App.4th 1099: "Although there are minor differences between CALJIC No. 2.03 and CALCRIM No. 362 . . . , none is sufficient to undermine our Supreme Court's approval of the language of these instructions."  (*McGowan*, at p. 1104.)

Brown has provided us with no cogent reason to reevaluate *McGowan*, and we follow its holding that there is no material difference between the language used in CALCRIM No. 362 and that used in CALJIC No. 2.03.  Based on persuasive authority from the Supreme Court, as well as our own, we reject Brown's constitutional challenge to CALCRIM No. 362.

X

*The Trial Court Did Not Violate Ex Post Facto Principles In*

*Sentencing Brown To Terms Of 25 Years To Life For Each*

*Count Of Forcible Oral Copulation In Concert Under The One Strike Law*

Brown contends the trial court erred in imposing sentences of 25 years to life for each of the six counts of forcible oral copulation in concert (Pen. Code, § 288a, subd. (d)

26

-- counts thirteen through eighteen) under the one strike law (Pen. Code, § 667.61, subd. (c)) . He argues the sentences violated the prohibition against ex post facto laws because the one strike law did not apply to forcible oral copulation in concert at the time the crimes were committed.

Penal Code "[s]ection 667.61, which provides indeterminate sentences for felony sex crimes committed under particular circumstances, is sometimes called the 'One Strike' law." (*People v. Anderson* (2009) 47 Cal.4th 92, 99.) A statute violates the prohibition against ex post facto laws by, among other things, inflicting greater punishment than that attending the act when it was committed. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 294.)

In December 2005, when Brown committed the forcible oral copulation in concert, Penal Code section 667.61, subdivision (c)(6) stated that the one strike law applied to "Sodomy or oral copulation in violation of Section 286 or 288a by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person."

Effective September 20, 2006, Penal Code section 667.61, subdivision (c)(6) was amended to apply the one strike law to, "Sodomy, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 286." The Legislature also added subdivision (c)(7), which provides that the one strike law applies to "Oral copulation, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 288a." (Stats. 2006, ch. 337, § 33, eff. Sept. 20, 2006.)

Brown contends the 2006 amendments "expanded the list of predicate offenses to include forcible oral copulation in concert. . . ." We disagree, because the amendments did not expand the list to include forcible oral copulation in concert; rather, that crime was a one strike offense before the 2006 amendment to Penal Code section 667.61. Before the amendment, Penal Code section 667.61, subdivision (c)(6) stated the one strike law applied to "oral copulation in violation of Section . . . 288a by force . . . ."

27

The crime of forcible oral copulation in concert (Pen. Code, §288a, subd. (d)) included the required element of force.  Thus, under the plain language of the pre-2006 version of Penal Code section 667.61, subdivision (c)(6), the crime of forcible oral copulation in concert was included in the one strike law.   (See *People v. Mancebo* (2002) 27 Cal.4th 735, 743 [the first task in construing a statute is to look to the language itself and when the language is clear and there is no uncertainty as to the legislative intent, we simply enforce the statute according to its terms].)

DISPOSITION

The judgment is affirmed.


       ROBIE    , J.


We concur:


   RAYE    , P. J.


   NICHOLSON   , J.